1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

8

SOUTHERN DISTRICT OF CALIFORNIA

9
10

11 | JAMES JIAO et al.,           Case No.:  17-cv-409-L(MDD)

12                 Plaintiffs,

**ORDER GRANTING DEFENDANTS'**

13 v.                     **MOTION TO DISMISS WITH**
**LEAVE TO AMEND**

14 MERRYLL LYNCH PIERCE, FENNER
& SMITH, INC. et al.,

15

16                 Defendants.

17      In this putative consumer class action, pending before the Court is Defendants'

18 motion to dismiss.  Plaintiffs filed an opposition, and Defendants replied.  For the reasons

19 stated below, the motion is granted with leave to amend.

20 **I.    BACKGROUND**

21      On June 23, 2016, in an administrative proceeding against Defendants Merrill

22 Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S") and Merrill Lynch Professional

23 Clearing Corp. ("MLPro"), the Securities and Exchange Commission ("SEC") released a

24 consent Order Instituting Administrative Cease-and-Desist Proceedings, Pursuant to

25 Sections 15(b) and 21C of the Securities and Exchange Act of 1934, Making Findings,

26 and Imposing Remedial Sanctions and a Cease-and-Desist Order.  (First Am. Compl.

27 ("FAC") Ex. 1 ("SEC Order").)  The SEC Order issued pursuant to a settlement with

28 Defendants.  As part of the settlement, Defendants admitted that from 2009 to 2012, they

1

executed a series of trades referred to as Leveraged Conversion Trades ("LCTs"), that

reduced the balance of their Reserve Account by billions of dollars and then used those

freed-up funds to finance firm inventory for their own gain.  (SEC Order at 1 & 6.)

Defendants were required to maintain the Reserve Account pursuant to the

Customer Protection Rule of the Securities Exchange Act of 1934, which provides a

formula for the balance Defendants were required to maintain in the Reserve Account.  It

also requires Defendants to maintain physical possession or control over customers' fully

paid and excess margin securities.  15 U.S.C. § 78aaa; 17 C.F.R. § 240.15c3-3.  The SEC

found that Defendants violated these provisions of the Customer Protection Rule.  (SEC

Order at 21.)

Defendants "conceived of and executed the [LCTs] during an extremely precarious

period of time in the financial markets."  The risk of default by Defendants and Bank of

America ("BAC"), their parent company, "remained heightened throughout the life of the

[LCTs].  (*Id.* at 15.)  Specifically, had Defendants or BAC

> failed, the funds [Defendants] set aside in [the] Reserve Account would have
> been distributed to customers in liquidation administered by the Securities
> Investor Protection Corporation ("SIPC").  By improperly reducing [the]
> Reserve Account by up to $5 billion to finance business activities,
> [Defendants] failed to maintain the required minimum amount in [the]
> Reserve Account.  During this period, the SIPC Fund, which SIPC maintains
> to cover shortfalls, was less than $2 billion, and prior to the adoption of the
> Dodd-Frank Act, SIPC, through the [SEC], was authorized to obtain a loan
> from Treasury of only an additional $1 billion.

(*Id.* at 15-16.)  If Defendants failed financially, the Reserve Account they "maintained to

make customers whole would be underfunded."  (*Id.* at 16.)  The SEC found, and

Defendants admitted, that regardless of the protections built into the LCTs, the

"customers would be exposed to significant market risk."  (*Id.; see also id.* at 1

(admission).)

Taking as an example just the February 2011 LCT involving a block of 310,000

Google common stock, the customers were exposed to "potential losses much greater

than $ 33 million." (*Id.*)  In addition to stock, the LCTs also involved convertible bonds, which "further increased the market risk to which [the] customers were exposed" because the convertible bond market was particularly illiquid during the relevant time. Accordingly, the bonds likely could not be liquidated without a "significant discount" and over "a period of time during which customers would not have been able to access their accounts." (*Id.*)  "[A]lthough no customers were harmed, [Defendants] put them at risk by reducing the customer money [they were] required to deposit into [their] Reserve Account by approximately 28% to 40%." (*Id.* at 14.)

The purpose of the LCTs was to finance Defendants' "firm inventory," "[b]y using customer cash." (SEC Order at 16.)  With this practice, Defendants "made approximately $50 million in profits . . ., which represents the amount [they] saved by using customer money to finance [their] inventory rather than doing so through other means . . .." (*Id.*)

In addition to the LCTs, from June 2009 to April 2015, MLPF&S "allowed tens of billions of dollars' worth of its customers' fully paid and excess margin securities to be held in a clearing account subject to a general lien by its domestic clearing bank (the 'Clearing Bank')." (SEC Order at 16.)  "Pursuant to the Clearing Bank's lien, if MLPF&S went bankrupt or defaulted on any debt it owed to the Clearing Bank, the Clearing Bank had the legal right to assert a security interest in those customers' securities." (*Id.*)  This practice violated the possession or control requirement of the Customer Protection Rule. (*Id.* at 18.)  When this practice was stopped by SEC enforcement in 2015, "[n]o customers suffered any losses or other harm as a result of the lien." (*Id.*)

Among other things, the SEC found that Defendants violated the Customer Protection Rule in that they failed to comply with the requirements that broker-dealers maintain (1) "a reserve of funds or qualified securities in an account at a bank that is at least equal in value to the net cash owed to customers," and (2) "physical possession or control over customers' fully paid and excess margin securities." (SEC Order at 21.)  In light of the violations, and pursuant to the settlement with Defendants, the SEC ordered, among other things, that Defendants disgorge their profits of $50 million and pay $7

3

million in prejudgment interest. (*Id.* at 22.) In addition, MLPF&S was ordered to pay a civil money penalty in the sum of $385 million. (*Id.*) All amounts were payable to the SEC for transfer to the general fund of the United States Treasury. (*Id.*) Finally, the SEC Order provided that

> [t]o preserve the deterrent effect of the civil penalty, MLPF&S agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of its payment of a civil penalty in this action . . ..

(*Id*. at 23.) A Related Investor Action is "a private damages action brought against the MLPF&S by or on behalf of one or more investors based on substantially the same facts as alleged in the [SEC] Order . . .." (*Id.*)

Upon learning of the SEC Order, Plaintiffs, who were Defendants' customers, filed this action on their own behalf and on behalf of similarly situated individuals in California. They allege that Defendants represented that they complied with legal requirements relating to customer investments, and failed to disclose their non-compliance. Based on the facts and violations found in the SEC Order, they seek compensatory damages for economic injury stemming from Defendants' violations of the Customer Protection Rule, and request disgorgement of Defendants' profits, among other things. (FAC at 16, 20-23.)

Plaintiffs assert claims for common law fraud, negligence and violation of California Corporations Code §§ 27101 *et seq.* and 27200. The Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). Defendants filed a motion to dismiss the operative first amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), (2), (3) and (6) for failure to allege, respectively, Article III standing, personal jurisdiction, proper venue, and any viable cause of action.

**II.     DISCUSSION**

A federal court "may not decide a cause of action before resolving whether the court has Article III jurisdiction." *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045,

4

1056 n.6.  The Court therefore first turns to jurisdictional arguments, which are considered under Rule 12(b)(1).

 "When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion.  A plaintiff suing in a federal court must show in his pleading, affirmatively and distinctly, the existence of whatever is essential to federal jurisdiction, and, if he does not do so, the court, on having the defect called to its attention or on discovering the same, must dismiss the case, unless the defect be corrected by amendment." *Tosco Corp. v. Communities for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001) (internal citations and quotation marks omitted), *abrogated on other grounds by Hertz Corp. v. Friend*, 559 U.S. 77, 82-83 (2010).

Defendants maintain that the Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. § 78bb(f) ("SLUSA"), preempts Plaintiffs' action.  "[D]ismissals under SLUSA are jurisdictional." *Hampton v. Pac. Inv. Mgt Co. LLC,* 869 F.3d 844, 847 (9th Cir. 2017).  A motion to dismiss based on SLUSA preemption is considered under Rule 12(b)(1). *Id.*

SLUSA "forbids the bringing of large securities class actions based upon violations of state law." *Chadbourne & Parke LLP v. Troice,* 571 U.S. 377, 380 (2014).  It provides in pertinent part:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging--
>
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f).

/ / / / /

1   Plaintiffs dispute that this provision applies to them and argue that Defendants'

2   alleged misrepresentations and/or non-disclosures were not made "in connection with the

3   purchase or sale" of securities.  Plaintiffs do not dispute any other SLUSA preemption

4   requirement.  (*See* Opp'n at 23.)

5        Plaintiffs argue that their fraud and negligence claims are not preempted.  Their

6   argument is twofold.  First, they contend that Defendants' alleged fraud did not induce

7   them to purchase or sell any securities.  Specifically, they argue that the "in connection

8   with the purchase or sale" requirement is not met because they "were customers of

9   Defendants before the [CLTs] began and there are no allegations . . . that the [CLTs] in

10  question were in connection with the purchase or sale of Plaintiffs' securities."  (Opp'n at

11  25.)  They maintain that the "'in connection with' requirement is met only where the

12  plaintiffs were induced" to make certain investment decisions, but they did "not allege

13  that they were fraudulently induced" to buy or sell securities from Defendants because

14  "the fraud . . . occurred after Plaintiffs had already . . . invested their assets" and,

15  furthermore, their damages are not based on a fraudulently induced purchase or sale

16  decision, but "lost opportunity costs."  (*Id.* at 23.)   Second, they claim that Defendants'

17  fraudulent trades, which affected only the reserve account, were too tangentially related

18  to any securities transaction by Plaintiffs.  They contend that "Defendants' behind-the-

19  scene[s] decision to reduce reserve account . . . had nothing to do with a sale or purchase

20  of securities by Plaintiffs."  (*Id.*; *see also id.* at 24.)

21       Plaintiffs' argument is precluded by *Merrill Lynch, Pierce, Fenner & Smith Inc. v.*

22  *Dabit*, 547 U.S. 71 (2006), which rejected the narrow interpretation Plaintiffs espouse

23  here, *i.e.*, "that an alleged fraud is 'in connection with' the purchase or sale of securities

24  only when the plaintiff himself was defrauded into purchasing or selling particular

25  securities."  *Dabit,* 547 U.S. at 85.  "For purposes of SLUSA pre-emption, [the]

26  distinction [between holders, as opposed to purchasers or sellers, of securities] is

27  irrelevant."  *Id.* at 89.  Plaintiffs concede they were holders of "covered securities" during

28  Defendants' fraud.  (*See* Opp'n at 23 ("fraud . . . occurred after Plaintiffs had already . . .

17-cv-409-L(MDD)

invested their assets" and not disputing the "covered security" requirement).)

To the extent Plaintiffs also imply that they were not induced to maintain the position in their shares by, and/or did not rely on, Defendants' representations that they complied with the Customer Protection Rule and/or nondisclosure of their reserve account manipulation, the argument is rejected. The complaint alleges that Plaintiffs were justified in relying on Defendants' false representations and non-disclosures, and that they were harmed by their reliance. (FAC at 19 ("In reliance on these representations . . . Plaintiffs were economically harmed . . .. [¶] Plaintiffs' reliance on said representations and omissions were [*sic*] justified . . ..").

The Court also rejects Plaintiffs' contention that Defendants' misconduct is too far removed from a securities transaction to meet the "in connection with" requirement. Plaintiffs' reliance on *Gavin v. AT&T Corp.,* 464 F.3d 634 (7th Cir. 2006) (Opp'n at 24-25) is unavailing.

The plaintiffs in *Gavin* were MediaOne shareholders. *Gavin,* 464 F.3d at 637. After MediaOne merged with AT&T, the terms of the merger entitled the plaintiffs to exchange their MediaOne shares for AT&T shares, a certain amount of cash, plus all unpaid accrued dividends, or some other combination of cash and AT&T stock of equal value. *Id.* AT&T notified the plaintiffs that they could claim their AT&T stock and cash free of charge by sending their MediaOne shares to AT&T's exchange agent. *Id.* The notice was sent three times. The third time the notice was not sent by AT&T directly but by Georgeson Shareholder Communicants, Inc., a third-party whom AT&T retained for post-merger "clean-up." *Id.* Georgeson's notice allegedly falsely stated that the plaintiffs would have to pay a fee to exchange their MediaOne shares, or their AT&T shares and cash would escheat to the state. *Id.*

The fraud claim was not preempted because it did not meet the "in connection with" requirement. *Gavin,* 464 F.3d at 638. MediaOne shareholders became beneficial owners of AT&T stock when the merger was consummated. *Id.* "The alleged fraud . . . happened afterwards and had nothing more to do with federal securities law than if

17-cv-409-L(MDD)

Georgeson had asked the MediaOne shareholders 'do you want your AT&T shares sent to you by regular mail or by currier?' and had charged an inflated fee for the courier service." *Id.*

*Gavin* materially differs from the case at issue.  Here, the misconduct underlying Plaintiffs' claims is that Defendants violated securities laws as found by the SEC.  No securities laws were violated in *Gavin*.  Furthermore, the lapse of time between the securities transaction and misrepresentation is not present here.  The relevant securities transaction in the pending case is Plaintiffs' decision to maintain their investments with Defendants.  Defendants' misrepresentations and omissions allegedly occurred while Plaintiffs were maintaining their investments.

The phrase "in connection with the purchase or sale" is construed broadly, rather than "technically and restrictively."  *Freeman Investments, L.P. v. Pac. Life Ins. Co.*, 704 F.3d 1110, 1117 (9th Cir. 2013) (quoting *S.E.C. v. Zandford,* 535 U.S. 813, 819 (2002)); *Dabit,* 547 U.S. at 85-89.

> Misrepresentation occurs "in connection with" the purchase or sale of a covered security if the fraud and the stock sale coincide or are more than tangentially related.  While this language is capacious, it doesn't reach all transactions in which securities play a role, however incidental.  The fraud in question must relate to the nature of the securities, the risks associated with their purchase or sale, or some other factor with similar connection to the securities themselves.

*Freeman,* 704 F.3d at 1116 (internal quotation marks and citations omitted).

Plaintiffs allege that, as found by the SEC, Defendants failed to comply with the Customer Protection Rule, represented to Plaintiffs that they complied, failed to disclose their noncompliance, and profited from it.  The action is based on the theory that unbeknownst to Plaintiffs and due to Defendants' misconduct, Plaintiffs' investments were exposed to a greater risk than Defendants represented.  The fraud in question relates to the risk associated with the securities Plaintiffs maintained with Defendants, and therefore meets the "in connection with" requirement.  *See Freeman*, 704 F.3d at 1116.

17-cv-409-L(MDD)

The fact that Plaintiffs found out about the fraud only after the SEC Order issued and long after they had invested their money with Defendants does not remove their claims from the broad scope of the "connection" under SLUSA. Claims based on similar allegations were found preempted in *Freeman Investments, L.P. v. Pacific Life Insurance Co.* and *Stoody-Broser v. Bank of America.*

In *Freeman*, the plaintiffs alleged that defendant, pursuant to an insurance contract, assessed a periodic "cost of insurance" charge against plaintiffs' investment accounts. 704 F.3d at 1114. Plaintiffs alleged that they understood the charge would be calculated according to industry standards, and that the defendant's charge was excessive. *Id.* They "argue[d] that the 'in connection with' requirement is satisfied only if they bought or sold a security in reliance on misrepresentations as to its value," and that the requirement was not satisfied because they were defrauded only after they had become customers. *Id.* at 1117 (internal quotation marks omitted). The court rejected the argument because *Dabit* does not require active trading, and because the defendant's alleged fraud (withdrawal of charge by liquidating a portion of plaintiffs' investment accounts) "coincided" with the sale of securities. *Id.* at 1117-18.

Similarly, in *Stoody-Broser,* the plaintiffs alleged "omissions of material fact and deceptive practices in connection with [the bank's] investment in proprietary mutual funds. For instance, . . . the trust beneficiaries had no advance knowledge of [the bank's] investments and . . . only learned about [them] after they were made. [T]hese omissions allowed [the bank] to reap millions as part of an unlawful 'scheme.'" 442 Fed. Appx. 247, 248 (9th Cir. 2011). The court found that "the essence of these allegations is that [the bank] fraudulently engaged in self-dealing," and found the claim preempted. *Id.*

For the foregoing reasons, Plaintiffs' action meets the requirements for preemption under SLUSA. The Court lacks subject matter jurisdiction to adjudicate the merits, and therefore does not address Defendants' other arguments for dismissal. *See Hampton*, 869 F.3d at 846. Plaintiffs are granted leave to amend. *See id.* at 848; *see also Stoody-Broser,* 442 Fed. Appx. at 248-49.

## III. CONCLUSION AND ORDER

Defendants' motion to dismiss is granted. The complaint is dismissed for lack of subject matter jurisdiction. Plaintiffs are granted leave to amend. Should Plaintiffs choose to amend, they must file and serve the amended complaint, if any, no later than August 20, 2018. Defendants shall file and serve a response, if any, no later than the time provided in Federal Rule of Civil Procedure 15(a)(3).

**IT IS SO ORDERED.**

Dated: July 18, 2018

Hon. M. James Lorenz
United States District Judge

17-cv-409-L(MDD)